## IN BANCO.

## P. NAONE vs. A. G. THURSTON.

Held, that the Act of 1851, imposing a special school tax upon foreigners, and persons of foreign parentage, is not unconstitutional.

The decision of the Court was delivered by JUDGE ROBERTSON.

This matter comes up to us on appeal from the decision of the Police Justice of Honolulu. The case was argued before the court in *Banco*, at the January term, and submitted for our decision, upon the following agreed statement of facts, viz:

"Naone, the plaintiff in this case, is Tax Collector for the district of Honolulu, in the island of Oahu, and claims of the defendant the several sums of one dollar poll tax, one dollar animal tax, and five dollars school tax; alleging that the defendant is of foreign parentage, and relying upon the statute entitled ' An Act to provide for the education of the children of foreigners, and those of foreign extraction in the city of Honolulu, and other places in the Kingdom,'— passed on the 28th day of June, 1851.

"The defendant in this case was born of foreign parentage, within the jurisdiction of this realm, and claims to be ·a ·Hawaiian subject by birth. (See vol. 1 Statute Laws, p. 76, Sec. 3.) Defendant has repeatedly tendered to the plaintiff the sums levied upon him as poll and animal taxes, and also the sum of two dollars, leviable in the nature of a school tax upon all subjects of this kingdom. (See Laws of 1850, p. 138, Sec. 12.)

" Charles C. Harris, Defendant's Attorney.

" Asher B. Bates, Attorney for plaintiff."

On the part of the defendant, it is contended that the Act of 1851, under which the plaintiff claims of the defendant a school tax of $5, is repugnant to the Constitution adopted in 1852, and at variance with the rights of one class of His Majesty's subjects; that the legislature cannot levy a larger tax upon those subjects who happen to be of foreign birth, or foreign parentage, than upon native aboriginal subjects, for the purpose of relieving the latter; that the Act of 1851 is unconstitutional because of the distinction it makes in the rate of tax between those persons who have children, and those who have none; and that it is void by reason of its uncertainty, in not defining what constitutes *foreign parentage*.

On the part of the plaintiff it is argued that there has always been, necessarily, a certain amount of special legislation in this country, particularly in the matter of taxation; that it is so under all monarchical governments; and that the Hawaiian legislature has the power to enact special laws, for special purposes, there being nothing to the contrary in the Constitution.

The decision of this case seems to turn, mainly, upon the question, whether or not the provision of the Act of 1851, levying a special and distinct school tax upon foreign residents and subjects of foreign birth or parentage, from that imposed upon all taxable male subjects of His Majesty, by the Act of 1850, be repugnant to the Constitution, which was adopted in the year 1852, and by the 103d Article of

which all laws in force at the time of its adoption, which were repugnant to its provisions, were declared null and void.

The learned counsel for the defendant, in the course of his argument, cited several articles of the Constitution in support of his positions, but we are unable to perceive the bearing of any of those articles, with the exception of the 15th, upon the question at issue. That article provides as follows, viz : " Each member of society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his proportional share to the expense of this protection; to give his personal services, or an equivalent, when necessary;" &c.

We understood the counsel for defendant to argue that the words *proportional share*, must be construed to mean a precisely equal share, and that taxes for the support of schools, or for any other purpose of government, must therefore be levied equally upon all classes. With the political justice of the theory contended for by the learned counsel, we have nothing to do at present. The question is, Does the language used in the Constitution sustain his argument ? By reference to the parallel passage in the Hawaiian version of the Constitution, it will be seen that the words translated *proportional share*, are *"ke kau waki hapa kupono."* We do not think that either the English or Hawaiian version means, necessarily, a precisely equal share. Such a construction would seem to be a straining of the language used by the legislature. When we reflect on the fact that, at the time the Constitution was framed, as at this day, the entire internal revenue of the kingdom consisted of special taxes, and that the legislature made no provision at that time to change the system of taxation, as it must of necessity have done if the construction contended for be correct, we feel perfectly satisfied that the legislature, in adopting the article under consideration, did not intend to render null and void all the then existing laws on the subject of taxation.

We find no provision, in any part of our Constitution, prescribing a particular system or mode of levying taxes, whether for general or special purposes. There is no provision to be found in it, similar to that contained in some written Constitutions, declaring that taxation shall be equal and uniform, and based solely upon property. The 16th Article contains the following provision, viz: "No subsidy, impost, duties or tax of any description, shall be established or levied, nor any money drawn from the public treasury under any pretext whatsoever, without the consent of both branches of the legislature;" &c. Beyond this, we believe, the Constitution contains nothing relating specially to taxation, although, of course, the subject must be regarded as forming a part of the general power of legislation vested in the House of Nobles and Representatives.

It will be seen, by reference to the 62d Article, that the grant of power to the legislature is very full, and couched in the most general terms. That article reads as follows, viz: "Full power and authority are hereby given to said legislature, from time to time, to make all manner of wholesome laws, either with penalties, or without, as they shall judge to be for the welfare of the nation, and for the necessary support and defense of good government; provided the same be not repugnant or contrary to this Constitution." This article confers full power to legislate upon any subject, and to lay taxes

for any purpose connected with the welfare of the nation, and the support and defense of good government. It has not been argued, as indeed we think it could not be with any show of reason, that the Act of 1851 is not a wholesome law, nor that the object to promote which it was enacted, is not necessary for the welfare of the nation, and we may add also for the support of good government.

The intention of the legislature in passing the law of 1851, is set forth in the preamble to the Act, which reads as follows, viz: "Whereas, the number of children of foreign parentage is rapidly increasing in Honolulu, and some other places on these Islands, who are destined to exert a great influence, for good or evil, on the community; and whereas, no provision has been made by law for their education in English as well as in the Hawaiian language, both of which have become necessary to men of business on these Islands."

Here, then, was a special, and we may say a local object, which in the opinion of the legislature called for its special interference. Previous enactments had made provision for the support of what are known as the "common schools," in which the rising generation might receive a limited education in the Hawaiian language only; but the rapid increase of children of foreign parentage, particularly in Honolulu, disclosed a new want not contemplated or provided for by those laws. It was necessary, in the opinion of the legislature, for the welfare of those children themselves, as well as for the best interests of the community at large, that a different and superior style of education should be provided for them, to that afforded by the common schools. This at once involved a question of ways and means, for a better style of education must, as a matter of course, cost a better price. It may be said that those who had children to be educated might, if they did not choose to send them to the "common schools," provide better at their own expense. But this would have left the option with the parents and guardians of such children of allowing them to grow up in gross ignorance, rather than incur the expense of suitable instruction This would not have been in accordance with the policy of the Hawaiian government, which makes the education of the rising generation one of the chief objects of its care.

In order to meet this special case, the legislature imposed a special tax upon that portion of the community from which the children to be educated sprung. We cannot see that such an enactment is repugnant either to the letter, or spirit, of the Constitution. This is not a question of rights and privileges. The rights and privileges of that portion of His Majesty's subjects upon whom this special tax is laid, are not abridged in the slightest degree by the Act of 1851.

The learned counsel argued that the Act is unconstitutional, because of the discrimination it makes between those persons who have children, and those who have none; the former being taxed five dollars, and the latter but three. We understood him also as contending, in the course of his argument, that the Act of 1850, is the law of the land, not having been annulled by the adoption of the new Constitution; and that our laws exempt natives who have four children from certain taxes. Granting that he is right in this last proposition, that the law of 1850 is in full force, with its exemptions of divers classes of persons from the "common school" tax; and that the law exempting natives having four children, from certain taxes is wise, politic

.and constitutional, as the learned counsel has argued, then his objection to the Act of 1851, on the ground of the discrimination spoken of, must fall to the ground; for if the legislature had a right to discriminate between those having four children, and those having none, in the one case, it had a right to discriminate between those having some children and those having none in the other case.

The Act of 1851 was not intended to relieve His Majesty's aboriginal subjects from one iota of their burdens, by laying them upon others, for they sustain the whole expense of the national "common schools," unaided by the foreign community of Honolulu. The few English schools for native children, recently established throughout the Islands, are supported in part by the voluntary contributions of parents, and partly from the general revenue of the kingdom.

It is not necessary for us to notice the last point raised on behalf of the defendant, viz: that the Act is void for uncertainty, inasmuch as it does not define what constitutes *foreign parentage.* It is admitted on the part of the defendant in this case, that he is of foreign parentage, and that, of course, waives any contest upon that question.

Let judgment be entered for the plaintiff with costs.